The UNITED STATES of America ex rel. George H. KIRBY, Trustee in Bankruptcy of Ross Construction Company in Reorganization under Chapter X,

v.

JOHN A. JOHNSON & SONS et al.
Civ. No. 1620.

United States District Court
E. D. Tennessee, N. D.
Nov. 4, 1954.

See also 111 F.Supp. 785.

S. Frank Fowler, Knoxville, Tenn., for plaintiff.

Clyde W. Key, Knoxville, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

This is an action to recover amounts allegedly due Ross Construction Company, hereinafter referred to as Ross, from John A. Johnson & Sons, Inc., hereinafter referred to as Johnson, other defendants being surety companies. Ross was a subcontractor with Johnson, prime contractor with the Atomic Energy Commission, hereinafter referred to as the Government, for construction work at Oak Ridge, Tennessee. Several subcontracts had been entered into between Ross and Johnson, but those on which sums are claimed by Ross as due and unpaid will be considered separately. In addition to accounts that arose under written contracts, certain claims are made with respect to items based either upon oral contract or upon usage between

the parties. These, too, will be considered apart from the others.

### Miscellaneous Claim for $860.13

 It appears that Ross and Johnson, in accordance with custom among contractors and subcontractors, operated on a give and take arrangement as to fuel, grease, and other materials, one borrowing from another as need arose and convenience was best served. While accounts thus created between borrowers usually kept themselves within reasonable balance, it is alleged by Ross that end of relations between Ross and Johnson left Johnson owing Ross $860.13. Plaintiff's exhibit 16 is filed in support of this claim. However, exhibit 16, made up of two yellow sheets, does not consist of original entries, its original source being a number of cards attached to it. Comparison of the yellow sheets with the cards leaves the claim unsupported, except in the sum of $385.25.

Johnson admittedly has no records for or against this claim, but would repel the claim on the ground that Ross made no demand for payment. Failure of demand for payment might in orderly dealings be at least persuasive as a defense, but the record in this and other connections shows that both parties dealt with each other in a surprisingly unbusinesslike manner, neither giving the other notice in a number of situations when notice should have been given.

This claim should be allowed in the sum of $385.25.

### 50-House Subcontract Claim for $1,098.00

 This claim is based upon oral contract for moving dirt for use in filling around 50 houses, payment to be made by Johnson to Ross on an hourly rental for machinery used in the work by Ross. This claim is supported by plaintiff's exhibit 15, which consists of one yellow sheet with attached cards. The items on the yellow sheet add up to the amount claimed. However, they are not original entries, but are derived from the cards, which support only $574 of the total.

Johnson's defense follows the pattern of the preceding claim and is rejected for the reasons there stated.

This claim should be allowed in the sum of $574.

### Contract No. 101—Claim for $39,349.86

This contract relates to work done by Ross in connection with construction of 500 houses. It has been stipulated by the parties that there remains due Ross on this contract the sum of $39,349.86 from Johnson.

### Contract No. 125—Claim for $3,583.59

 This contract relates to work done by Ross in connection with construction of what is known as the Bulk Shielding Plant. Proof of most significance in relation to this claim is in explanation of plaintiff's exhibit 5 and defendant's exhibit 32. Johnson admits that there remains due Ross $2,536.24 under this contract. The parties disagree as to items designated as "borrow fill" and "rock excavation."

Ross' exhibit 5, a collective exhibit consisting of statements of work done and applications for payment, shows 5,100 cubic yards as the quantity of borrow fill. Defendant's exhibit 32 shows the same quantity, but from this quantity Johnson deducts 686 cubic yards which it says represented rock furnished by Johnson. This deduction caused a difference of $686 between the amount claimed for this work and that which is admittedly due.

Plaintiff's statement and application for payment bear date of June 19, 1951. They bear designation as estimate No. 4 (final). But estimate No. 3, statement and application for payment dated November 6, 1950, shows borrow fill completed as of that date as 4,648 cubic yards, which is only 452 cubic yards less than the final estimate. This discrepancy casts serious doubt on Johnson's claim that it furnished 686 cubic yards of the total of 5,100. Moreover, testimony of witnesses is to the effect that Ross com-

pleted the 5,100 cubic yards and that any work done by Johnson under this heading was in the nature of additional work made necessary by rains and not chargeable to Ross. This item of set-off, accordingly, should be disallowed.

The second point of disagreement relates to rock excavation. Ross' statement and application for payment dated June 19, 1951, exhibit 5, shows the quantity of rock excavation completed as of that date as 389 cubic yards. Johnson's exhibit 32 shows 323.3 cubic yards. The difference as between the two exhibits represents the sum of $361.-35.

On November 6, 1950, Ross submitted statement and application in which rock excavation is shown as 347 cubic yards completed as of that date. The statement and application of September 8, 1950, shows this same yardage. Johnson's estimate of 323.3 cubic yards purportedly was based upon the Government's final estimate. But the Government's final estimate, filed as exhibit 33, does not contain the figure 323.3 under any heading. Nor does it list any item of work that can be identified as corresponding to the rock excavation items shown in exhibits 5 and 32. Exhibit 5 was notice to Johnson that Ross was claiming, from September 8, 1950, considerably more than 323.3 cubic yards, and from June 19, 1951, 389 cubic yards. The Government's final estimate, dated May 9, 1952, recites: "Type of Contract, Lump-Sum-Unit Price." Absence from this final estimate of any item that can be identified as the rock excavation in question leaves room for an inference that the rock excavation in question was a lump-sum item and required no final estimate.

In further proof of Ross' claim for $3,583.59 is plaintiff's exhibit 7. This is a ledger entry of June 19, 1951, which shows that the balance due on the Bulk Shielding Plant is $3,583.59. Although evidence is in conflict and both inadequate and difficult to follow, there is a preponderance in favor of Ross in support of the full amount claimed.

Accordingly, this claim should be allowed in the amount of $3,583.59.

Contract No. 112—Claim for $22,124.97

This contract relates to work done by Ross in connection with construction of a high school building. Ross claims $22,124.97 as due and unpaid on this contract. Extensive proof has been introduced, much of which is incapable of exact application. However, two exhibits point to an answer to this particular claim.

Johnson admits that the amount due Ross on contract 112 is $11,112. Ross' ledger sheet, exhibit 10, shows a balance due of $19,061.35, the last entry thereon being June 1, 1951. Yet the statement of work done and the application for payment dated June 1, 1951, are not in accord with the ledger balance. The statement and application, exhibit 9, show value of work completed as of June 1, 1951, as $105,508.34. With this figure reduced by retainage of $6,-938.66 and previous payments of $91,-233.77, the amount applied for is $7,-335.91. The retainage and the amount applied for add up to $14,274.57, which is less than the ledger balance by $4,-786.78.

Defendant's exhibit 27 purports to be a final summary of Ross' account on the high school contract. This summary shows the value of Ross' work as $109,-152.29, which is $3,643.95 higher than Ross' own estimate. A comparison of exhibit 27 with exhibit 9 discloses that Johnson's estimates, item by item, are equal to or greater than Ross' estimates.

Cancelled checks filed by Johnson as collective exhibit 26 show payments to Ross in total sum of $102,322.58. With three exceptions, these checks are identifiable as checks paid on account of contract 112. The three exceptions are a check for $4,953.12, payable to Southern Building Products, Inc.; a check for $4,322.50, payable to J. Ryan Cooper; a check for $5,630.53, payable to Ross Construction Company, without identity as to the contract to which it applies.

Southern Building Products, Inc., is shown to be owned by Johnson. This presents the question whether, in balancing its accounts with Ross, Johnson had a legal right to include this payment to its subsidiary. For reasons which will appear, it is not necessary to answer that question.

The untagged check payable to Ross is allowable for the reason that there was by their terms interrelation between all of these subcontracts of Ross and Johnson. Moreover, the payment to Ross became an asset of the estate of Ross, available to creditors.

█ Less acceptable is the payment made to J. Ryan Cooper for work on the project done by Cooper. Johnson's proof is that this payment was made with the approval of the trustee's counsel. This is not controverted. For the reason that it would be inequitable for the trustee, through his attorney, to approve the payment and then require that it be paid again, this payment should stand to Johnson's credit.

Another item that should be credited to Johnson is that of $1,330.15, shown as the value of work done on the high school job on behalf of Ross by Joe Cameron Construction Company, Inc.

Ross claims $2,094.04 as back charges, the evidence of which consists of a collection of cards with original entries, but which are unintelligible for purposes of evidence.

█ Without recapitulation of figures it can be seen at a glance that Johnson owes no more than it admits owing. To this, however, should be added one small item as an exception. Johnson has charged $65.19 against Ross as cost for repairing a manhole, allegedly damaged by Ross. The proof does not sustain this charge and it should not be allowed.

Ross' claim under this contract should be allowed in the sum admitted as due, plus the $65.19, or a total of $11,177.19.

Contract No. 126—Claim for $5,273.69 and Set-off Claim of $98,323.38

This contract relates to work done by Ross and by Johnson in completion of the Ross subcontract in connection with the construction of a research laboratory building.

Ross admits that Johnson is entitled to a credit of $20,690.44 on account of payment of creditor claims by Johnson.

The latest claim for payment made by Ross is that shown as plaintiff's exhibit 17. Therein Ross claimed as the value of work completed as of that date $63,728.22. After deducting 10% retainage of $6,372.82 and previous payments of $52,160.20, application was made for $5,195.20. Other notations on the exhibit show payment of this last-named sum. There is no notation as to payment of the retainage.

Filed by Johnson as exhibits 57 and 61 are cancelled checks which show payments to Ross on this contract of $58,655.40. This subtracted from the work value of $63,728.22 leaves an unpaid balance of $5,072.82, which is $200.87 less than Ross claims.

Of greatest difficulty here is Johnson's claim of $98,323.38 as set-off. This claim arose out of alleged failure of Ross to complete its work on schedule and abandonment of the uncompleted work by the trustee. Johnson's proof is centered around defendant's exhibit 62, which purports to show what contract 126 would have cost Johnson, had Ross completed it, and what it cost Johnson by reason of Ross' alleged failure to complete it. What it would have cost is shown as $148,413.48; what it actually cost is shown as $238,548.82, the excess cost to Johnson being $90,135.34.

This comparison, however, does not stand up. In showing what the contract would have cost Johnson, had Ross completed it, the work is grouped into Items I and II, Item I being the lump-sum items; Item II being the unit-price items. For the cost to Johnson of the lump-sum items, had they been com-

886

pleted by Ross, Johnson shows five items and a total cost of $50,243.50. In showing what it actually cost Johnson, this exhibit shows an amazing expansion. The original 5 lump-sum items become 19 lump-sum items and their total cost $137,459.08. The added 14 items represent a claimed extra cost of $87,000. In 8 of the unit-price items, Johnson is charging Ross higher unit prices than called for in the Ross subcontract, the upped unit prices resulting in an additional excess of $2,947.46. These two excesses total $89,947.46.

■ Accounting for a substantial portion of the excess was that part of the work designated as footings, or footers. There were about 200 of these footings, excavations therefor being pits below the lower general excavation level. Ross claims that the footings were no part of his contract. Johnson claims that they were included in the words *all excavation, grading and related items,* contained in the subcontract. This claim would be sound, if no contrary circumstances appeared. But such circumstances do appear. The parties operated for several months under an oral contract. While they were so operating, a question arose about who should do the footings. Then Johnson called upon Ross to sign a written contract. This Ross refused at first to do, asking that a rider be attached to the contract showing that footings were not included in the work of Ross. Johnson held up further payments to Ross and refused to resume payments until Ross had signed the contract. Meanwhile, Ross' bank account dwindled and operating funds disappeared. A final request for payment was spurned by Johnson, and Ross, faced with labor demands and lack of funds, as an act of desperation signed the contract.

■ In the Court's opinion, this contract was signed by Ross under duress, a form known as duress of property. Johnson v. Ford, 147 Tenn. 63, 245 S.W. 531. As a result, Johnson can claim no rights under it that were not within the terms of the oral contract under which the parties operated prior

to its execution. The proof shows that Ross had contracted a great deal of work for Johnson, that Ross operated by machinery only, that Ross had never done any footings for Johnson or anybody else, and that in listed unit prices between Ross and Johnson there is none comparable in size to that Johnson would charge against Ross for excavation of footings, work dependent largely upon manual operations. It is the Court's finding that the oral contract under which the parties operated did not contemplate the doing of footings by Ross.

A further matter which indicates inequitable conduct on the part of Johnson in connection with this contract is discernible in exhibits on file, as supported by testimony. A short time before abandonment of the contract, Ross was engaged in work known as backfill. The number of cubic yards finished does not appear. He was required to discontinue the backfill in order to make room for other construction forces. At that time, February 9, 1951, the "bulk" of the Ross work was done, if Johnson's own representations are to be believed. Despite that fact, Johnson claims it cost an excess of about $90,000 to complete what was left, not including the "bulk."

Further inequity appears in connection with Johnson's charge of excessive blasting on the part of Ross, alleged results being removal of material beyond the specified floor level of the excavation and outside the wall location, necessitating excessive backfilling. Excluding backfill due to footings, Johnson's own figures fail to show backfill in excess of the agreed estimate. But in the event there was outside excavation in excess of specifications and removal of inside material in spots to a greater depth than called for, the blasting to which these excesses are attributed by Johnson was done at Johnson's own insistence, and for the purpose of speeding the work.

In the memorandum opinion of April 24, 1953, 111 F.Supp. 785, at page 787, in which the Court upheld Johnson's

claimed right of set-off, the following appears:

'The cases indicate that the answer is to be reached through equitable considerations in relation to the purposes of Chapter 10. See Lowden v. Northwestern National Bank, 298 U.S. 160, 56 S.Ct. 696, 80 L.Ed 1114; In re Rosenbaum Grain Corporation, 7 Cir., 103 F.2d 656, 657; In re Howell & King Co., D.C.M.D.Pa., 15 F.Supp. 151; In re Missouri Gas & Electric Service Co., D.C.W.D.Mo., 11 F.Supp. 434; Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 3 Cir., 174 F.2d 783.

"As the Court interprets the conclusion of the courts in the foregoing cases, the rule is that a claim of a creditor may be offset against a debtor in a reorganization proceeding, provided the court is of the opinion from all of the facts that the equities require such offsets. * * * *"

■ The converse, not there stated, is that if the equities do not require that off-set be allowed, it should not be allowed.

■ It further appears that following commencement of the reorganization proceeding, the trustee was advised by Johnson that the latter was indebted to Ross in the approximate amount of $35,000; that in reliance on this information and Johnson's promise to make prompt payment the trustee expended over $7,000 in an effort to complete the Ross work under subcontract 126, and further sums toward completing other work which Ross had subcontracted, the total expenditures of the trustee amounting to about $24,000. Significance of this evidence is not clear further than its claimed and possible prejudice to creditors of Ross, there being at the time no operating funds other than this admitted indebtedness of $35,000. However, aside from prejudicial effects in material matters, Johnson's admission that $35,000 was due Ross, coupled with Johnson's promise to pay and subsequent refusal to pay, is positive evidence of Johnson's inequitable treatment of Ross in their contract dealings.

Nevertheless, Ross admits that Johnson is entitled to set-off in the sum of $20,690.44 and a tentative set-off of the McClary item, which is the $4,386.17 sued for by McClary in the state court.

As against this, Ross has established by a preponderance of evidence $5,072.82 as the amount due Ross.

Accepting the sum of $148,413.48 as correctly representing the cost to Johnson, had Ross completed the subcontract work, it should be again noted that cancelled checks show payment to Ross of only $58,655.40. When the amount paid is subtracted from $148,413.48 there is a remainder of $89,758.08, an amount more than adequate to meet any portion of the claimed set-off which has not lost the saving grace of equity.

There is pending in a state court a suit by McClary Construction Company against Ross and Johnson to recover $4,386.17 for work done by McClary. Ross concedes that this sum should be allowed as a tentative set-off.

The foregoing opinion results in the following, by way of recapitulation:

| Work Description | Sum Due Ross | Sum Allowed As Set-Off |
|---|---|---|
| Miscellaneous claim (fuel, grease, etc.) | $ 385.25 | None |
| 50-House subcontract | 574.00 | None |
| Contract No. 101 | 39,349.86 | None |
| Contract No. 125 | 3,583.59 | None |
| Contract No. 112 | 11,177.19 | None |
| Contract No. 126 | 5,072.82 | $20,690.44 (unconditional)<br>4,386.17 (tentative) |
| | $60,142.71 | $25,076.61 |

888

The difference is $35,066.10, for which plaintiff is entitled to judgment against the defendant, but with the condition that $4,386.17 be retained by the Clerk of the Court pending outcome of the McClary suit and subject to further orders of the Court.